UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

VS.                                                           CAUSE NO.: 3:15CR022

GRAEME PHILLIP HARRIS                                              DEFENDANT

---

## SENTENCING MEMORANDUM

---

COMES NOW, Graeme Phillip Harris, Defendant in the instant case, by and through counsel, David G. Hill, and submits this Sentencing Memorandum in support of his Position With Respect to Sentencing Factors and for consideration by the Court prior to Defendant's sentencing hearing scheduled for Thursday, September 17, 2015, and in support of the same shows unto the Court the following:

I.

### INTRODUCTION REGARDING SENTENCING STANDARDS

"Under the post-Booker advisory system, the Federal Sentencing Act 'requires a sentencing court to consider Guidelines ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well.'" *United States v. Archuleta*, 412 F.3d 1003, 1006 (8th Cir. 2005)(*quoting United States v. Booker*, 125 S.Ct. 738, 757 (2005)). Subsequent Supreme Court decisions have significantly broadened the range of sentencing choices dictated by the specific facts of the case. *See e.g., Gall v. United States*, 552 U.S. 38 (2007)(finding a sentence outside the Guidelines to be reasonable); *Kimbrough v. United States*, 552 U.S. 85 (2007)(noting that courts may vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines); *Rita v. United States*, 551 U.S. 338 (2007)(holding that a

district court may consider arguments that the Guidelines sentence itself fails to properly reflect § 3553(a) considerations); *Cunningham v. California*, 549 U.S. 270 (2007)(stating that judges are no longer tied to the sentencing range indicated in the Guidelines but are obliged to take account of that range along with the sentencing goals enumerated in 18 U.S.C. §3553(a)). These cases mean that a district court is free to make its own reasonable application of the § 3553(a) factors, and after due consideration, decline to impose a sentence based on the Guidelines. *See Kimbrough*, 552 U.S. 85 (Scalia, J., concurring).

18 U.S.C. § 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 3553(a)(2). These purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Section 3553(a) further directs sentencing courts to consider, among other things: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; and (7) the need to provide restitution to victims. In addition, 18 U.S.C. § 3661 states that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Additionally, application Note 6 of Section 5C1.1 of the Guidelines authorizes the Court to depart downward from an otherwise appropriate guideline sentence where the Defendant is an

abuser of alcohol and the defendant's criminality is related to the treatment problem to be addressed.

II.

<u>GRAEME'S FAMILY BACKGROUND</u>

Graeme Harris is the only son and oldest child of Malcolm and Monica Harris.

Malcolm and Monica Harris have fashioned their blue collar/farm family work ethic and Malcolm's willingness to do very dangerous work into a solid, small, family run business. Their roots are humble and their success impressive.

Malcolm Harris is from a small town called Warrandyte on the outskirts of Melbourne, Australia. Malcolm got his start in construction and technology when he attended a technical school from what we would call grades 7-11. He followed that in an apprenticeship program for 4 years at a Technical Institute at the conclusion of which he earned the designation of Master Builder. By age 24 he had landed a position with Andrew Corporation to build communication towers throughout the Australian Outback and to install a microwave system that encompassed the entire country.

Andrew Corporation then asked Malcolm to come to the United States to assist in building out the MCI microwave system that covered all of the U.S.

After that Andrew Corporation work, Malcolm went to work for a company called Scientific Atlanta building earth station antennas on military bases in Turkey and outside Canberra, Australia at the original tracking station for NASA during the Apollo missions.

Shortly thereafter, Andrew Corporation offered Malcolm a return to the U.S. on a permanent work visa. He ultimately accepted that proposal and at Andrew's suggestion started his own company with referral business from Andrew Corporation. Malcolm first started Southern Cross Communications in 1990 (named for the constellation of stars only visible from the Southern hemisphere which is prominently displayed on the Australian flag). In 1998, Malcolm formed Engineering & Wireless, LLC, along with a number of friends. In 2000, that partnership was

4

dissolved and Malcolm took full ownership of Engineering & Wireless, LLC, and brought in his wife, Monica, to help run the company from the business side. After 1990, either through Southern Cross or Engineering & Wireless, Malcolm has constructed communication towers in Mauritania, Africa; Senegal, Africa; all of the Bahamas; and the entire Southeastern United States. The family company routinely works for all the major communication carriers.

Monica Harris is from Western Pennsylvania, in a farming community near Butler, Pennsylvania, north of Pittsburgh. She is the second oldest of eight children in a working farm family. Accordingly, not only was she expected to daily perform assigned farm chores, she and her sister participated in the raising of six younger brothers. As an adolescent, to earn spending money Monica and her sister both had paper routes in addition to farm chores and household family duties.

After high school, Monica attended night school at Erie Business Center in Erie, PA, where she took basic business courses such as basic accounting principles, basic bookkeeping, figuring payroll, payroll tax deductions, etc.

After Malcolm assumed sole ownership of Engineering & Wireless, LLC in 2000, he brought Monica on board to help focus the company and to manage the company's debt. She has continued to this day as Office Administrator/Business Manager overseeing such things as accounts receivable, accounts payable, payroll for up to 30 employees, insurance coverage (worker's comp, health, liability, property, etc.), tax compliance, personnel matters, etc. Together, she and Malcolm Harris truly are a family run, American small business.

Undersigned counsel writes the above parental histories to give the Court a view of the working class values which undergird this family and which serve as the foundation for who Graeme Harris really is. Malcolm Harris is a self-made business man. His business is not based

on advanced education from a business school or a finance school. It is based on a lot of technical knowledge, some from technical school, but a lot more from on the job training combined with the willingness to build and climb 300 foot communication towers. And it aided by the farm family, common sense business skills of Monica Harris. Nobody has given Malcolm or Monica Harris anything. They were taught to earn and they have taught their children to earn.

III.

GRAEME'S OWN WORK HISTORY AND WORK ETHIC

Graeme started working for Engineering and Wireless, LLC when he was 16 years old. Initially his work was support work such as cleaning the work yard, cleaning the warehouse, cleaning company vehicles and running needed parts to job sites. By age 17, Graeme started working on actual job sites doing support work there such as digging trenches, pouring concrete and other manual tasks as directed by the crew chief. At age 18, and after rigorous safety training, Graeme started climbing towers and started learning to perform the work for which this family company actually earns income. Since turning 18, Graeme is routinely in crews (at least 2 men, usually more) doing such tasks as taking down cell tower antennas and the attached coax cables for a given carrier; or tower mapping, that is evaluating a tower and measuring its structural components to determine if the tower is strong enough to handle requested modifications; or beefing up a tower to allow it to be structurally stronger to accommodate more weight and modification; or by fully installing new 4G LTE networks; or by actually 'stacking' or building new towers from the ground up; or disassembling existing towers that are out of date or have serious structural issues; or by doing tiger team work, that is the locating and replacing of bad or faulty connections in a cell tower system. Since age 18 Graeme has worked on such projects for AT&T, Sprint, T-Mobile, Verizon, Southern Link, CSpire, Balteco, Nextel, MetroPef and

Comcast.  Graeme has recently completed training as a cell tower rescue technician, which means in addition to having the requisite skills necessary to be allowed to perform the required tasks while suspended on a cell tower, including the use of power tools, Graeme possesses the requisite knowledge and skills to come to the rescue if another climber gets in distress while on a tower.

Graeme works for the family company year round, obviously though more so during the summer months.  Even during the school year he takes no classes on Friday and returns home to work on Friday and the weekends, either on a tower or at the company warehouse.

In addition to the hours he puts in at the family business, Graeme attends the University of North Georgia in Oconee as a full time student taking classes Monday through Thursday.  He is studying business and hopes he can someday use his business degree to further advance his family's business.

IV.

<u>HOW DID GRAEME GET FROM THERE TO HERE?</u>

Undersigned counsel presents the following information to the Court, not as an excuse for Graeme's conduct (he accepts full responsibility), but as an explanation as to how a teenager from such a strong, family oriented, working class background with such solid core values ends up before this court.

Even as a very young child Graeme excelled at anything athletic he tried.  He was the best swimmer, the best diver, the best soccer player and the best runner.  He started competing in triathlons at age 12.  By the time he reached high school he had developed into a pretty good football player – a quarterback.

In the 9th grade at Milton High School the varsity coach suggested that Graeme transfer to Alpharetta High School where it was believed Graeme would have a better chance of competing

for the starting quarterback position (since Milton's starter had 2 more years of eligibility). The Milton coach arranged a meeting for Graeme and his family with the Alpharetta coach – an African American, a former Georgia Tech player with a degree in Economics. Graeme and his family were very impressed with the Alpharetta coach and they made the family decision to transfer Graeme there for his 10th grade year. In his sophomore year Graeme went out for the junior varsity team, earned the starting quarterback job and was selected the team's most valuable player at the conclusion of the season.

During the remainder of that year, including spring practice, the head coach told Graeme he was going to be the starting quarterback the following year, or at least would be expected to compete for the position. He even introduced Graeme to college recruiters when they were visiting the school as a player they should keep an eye on.

But something happened over the course of the summer between his 10th and 11th grade years. When fall practice began there were about 16-18 players who hadn't been in school the previous year. Graeme assumed they had been recruited. One of those players was a quarterback who was the new starter, no questions asked. Graeme was told he could try out for another position, but he would not be playing quarterback. He was given no opportunity to complete with the first team and was relegated to sitting on the bench during games. Needless to say, whether rightfully or wrongfully, Graeme felt slighted, mistreated, even discriminated against on the basis of his race – by a coach whom he had previously held in such high regard. In Graeme's eyes the black coach preferred the black kid to the point of not even allowing a meaningful opportunity to compete. This left a bitter taste in Graeme's mouth or as Mr. Harris put it in his interview with the probation officer "with a chip on his shoulder". Graeme transferred his senior year to a new school in the district with few experienced players. He won the starting quarterback job, but suffered a

8

shattered clavicle in the first game after a vicious hit which effectively ended Graeme's playing days.

After high school graduation Graeme applied for admission to the University of Mississippi and was accepted. During orientation his first semester University representatives strongly urged participation in the University's "Greek" system. After discussing with his parents Graeme decided to participate in the University's "rush" season and was accepted as a pledge in the Sigma Phi Epsilon fraternity. This will probably be the worst decision Graeme and his parents will ever make – for two reasons. First, even though University representatives made every effort to sell the Greek system during orientation, the Harris family did not know they were putting Graeme in a segregated, racially exclusive environment where racism was blatantly and actively practiced within the confines of the Sigma Phi Epsilon house. As Mr. Harris put it to the probation officer when the officer interviewed Mr. Harris it was "like pouring gasoline on a fire". Graeme's feelings of being mistreated a few years earlier on the basis of his race were only exacerbated and incited inside the fraternity. Graeme learned of the fraternity's anger at such things as 1) having Colonel Reb taken away, 2) not being able to chant "The South will rise again" during football games at the conclusion of the band's playing "From Dixie with Love"; and 3) the taking away of the Confederate flag at sporting events. Things such as these happened years before Graeme Harris ever set foot on the University of Mississippi campus, before he was even out of grammar school, and he only learned of them as the fraternity's anger has been passed down within the fraternity from pledge class to pledge class.

In addition, when Graeme was initiated into the fraternity, he was told by the fraternity leaders that no blacks were allowed in the house socially, that the only blacks allowed here are "back there" (pointing to the kitchen) and they are here to "serve us". And during the "pledgeship"

or indoctrination period, the fraternity leaders chanted and the new pledges learned, a racist chant similar to the one played recently on YouTube that brought such disfavor to the University of Oklahoma. At the University of Mississippi, within the walls of the Sigma Phi Epsilon house, Graeme learned that blatant racism was not only ok, it was expected.

Graeme Harris was not raised in a racist home. (Please see the letter from Paolo Guarisco, Graeme's biracial friend from a Liberian mother, as to how Mr. Guarisco has been treated in the Harris home by the Harris family). Graeme's parents are not university educated and have no experience with what goes on in a fraternity, nor did they know that he was joining a "segregation club, a disgusting organization promoting a disgusting culture" (to quote Mr. Harris in his interview with the probation officer). Otherwise, they would not have advised Graeme to join, and both Mr. and Mrs. Harris feel betrayed by the University of Mississippi for not candidly disclosing how racially exclusive "greek life" is at the University of Mississippi.

Second, when the Harris family all agreed that Graeme would join a fraternity, nobody realized that Graeme would be put in an environment where alcohol would be so easily available for unlimited, unsupervised, underage drinking. Alcohol was available in the individual rooms in the house and in the kitchen, in the cabinet and in the refrigerator. Getting drunk, not just drinking, was a regular occurrence at the fraternity house.

Just like Graeme Harris did not need to be exposed to a hotbed of racism, because of the leftover feelings from his youthful disappointment, Graeme Harris did not need to be exposed to readily available alcohol. (In fact, no teenager inexperienced in responsible drinking, should have access to unsupervised alcohol consumption). Graeme has shown a tendency to drink too much when he drinks. He drank too much on Saturday evening, February 15, 2014, and on Sunday morning, February 16, 2014. Alcohol affects judgment. It can affect anybody's judgment, no

10

matter age, education level, or maturity. A sober Graeme Harris would have realized the folly of his actions. A sober Graeme Harris would have never committed such a thoughtless act, no matter his youthful disappointment. In fact, a sober Graeme Harris, shortly after the incident wrote a text message to his younger sister that said, in essence, "I have done something that will mess up the rest of my life".

V.

SUBSTANCE ABUSE AND APPLICATION OF SECTION 5C1.1

Graeme Harris would not be before this Court but for his excessive consumption of alcohol on occassion. All three participants in this sordid event which has landed Graeme in trouble acknowledge being wasted drunk on that Saturday night/Sunday morning.

Does Graeme Harris abuse alcohol? Does Note 6 of §5C1.1 apply to him? As his counsel, the undersigned submits Section 5C1.1 applies giving the Court the authority to depart downward in determining a sentence most appropriate for Graeme Harris. Clearly, alcohol was at the heart of the event which has landed Graeme before this Court. All three participants have admitted to over indulging and all admit to being very drunk when Edenfield tied the rope first to the statue, then to a storm grate. Additionally, several non-participant fraternity members gave statements to the FBI about how drunk Graeme seemed as that evening progressed.

Does Graeme abuse alcohol? Clearly, when a young person by age 20 has 4 underage drinking legal issues and a serious federal court case and alcohol is present every time, a red flag is certainly raised. Is Graeme an alcoholic? Probably not, at least not in the sense that he has to drink every day. But that is not the question in Section 5C1.1. The question is does he abuse alcohol? That answer from his personal history is yes. Graeme has acknowledged to his counsel that alcohol certainly gets him into trouble, and it appears that his abuse of alcohol is that when he drinks, he drinks too much, is out of control, and does not stop when he should (of course, as an

11

underage drinker he shouldn't be drinking at all). The specific facts in this case show he was wasted drunk on February 16, 2014. He has had other arrests for underage drinking when his BAC was well above the legal limit - .186 the last time in May of this year. After his last alcohol related brush with the law, Mr. Allen Bell, the U.S. Probation Officer in the Northern District of Georgia serving as Graeme's bail supervisor, obviously thought Graeme needed alcohol related treatment. He suggested that Graeme should enroll in a treatment program and Graeme complied. After meeting with two counselors to assess him and evaluate his need for intervention, Graeme was accepted into a 17 week group therapy treatment program at Advantage Behavioral Health Services (ABHS) in Athens, Georgia. That program started on or about July 27, 2015. The patients meet at ABHS in Athens for 3 hours on Monday nights. According to Ms. Tamisha Rogers, treatment administrator, the therapy program is designed to educate as to abuse consequences, to explain and develop strategies for abuse awareness, strategies and skills for maintaining self-control, managing shame and humiliation and restoring self-respect and sense of worth. This group therapy program will conclude at approximately Thanksgiving of this year.

In considering whether a 5C1.1 departure is appropriate, the Court should consider whether the 1) likelihood that completion of the treatment program will successfully address the treatment problem and 2) whether imposition of less imprisonment than required in Zone C will increase the risk to the public from further crimes of the defendant. As his counsel, the undersigned submits several things for the Court to consider. First, Graeme has no criminal conduct in his personal history that is not alcohol related and alcohol centered. He has several minors in possession of alcohol charges, with one of those still pending. Next, the charge before this Court has alcohol consumption and the resulting lack of sound judgment at its core. If Graeme weren't wasted drunk on February 16, 2014, he would not have engaged in such thoughtless, ill-advised and downright

12

stupid conduct. Next, his alcohol abuse is over doing it, going too far, drinking too much. The current therapy program is intended to raise his abuse awareness, teach him to recognize abuse conduct, teach him strategies and skills for maintaining self-control over his personal life, including alcohol consumption, to recognize and manage life's personal stressors without resorting to excessive consumption of alcohol, and to manage shame and humiliation resulting from abusive conduct, restoring self-respect and self-worth.

Judging from the many letters of support submitted on Graeme's behalf, he comes from a family with a strong set of core values – including love and respect for family, appreciation for earning through hard work, respect for adults, respect for authority, and caring for others. Graeme has a strong network of support, in his own family, in the community he calls home, and in his family's friends. Without alcohol, he is not a violator of the law. He is developing an awareness of how alcohol has gotten him into trouble and he is learning to never let alcohol cloud his judgment or otherwise cause him to come into contact with the legal system. On behalf of Graeme Harris, undersigned counsel submits that Section 5C1.1 authorizes the Court to depart downward and fashion a disposition in this case outside of Zone C.

VI.

WHAT SENTENCE IS NEEDED FOR GRAEME HARRIS

Graeme Harris is a quality young man from a quality family with strong core values. He allowed youthful disappointment combined with the wrong college environment to lead to his committing acts he knows were thoughtless, insensitive, plainly wrong, and downright stupid. He recognized it immediately when sober and wrote his sister that he had "messed up the rest of my life". The letters from family and friends recognize a change in Graeme to a more serious and reflective person.

13

Of course, the nature of the acts which bring Graeme before this court are such that Graeme will in effect spend the rest of his life atoning for his conduct, attempting to remove himself from the light in which he has cast himself, and convincing all whom he meets that he is a far better person than the events of February 16, 2014 indicate. Though not court imposed, it is certainly a lifelong repercussion and in effect a punishment.

Graeme Harris has a lot of promise, individually as a person, with a family instilled strong work ethic and a strong desire to succeed. He wants to do well and he wants to be a better person. He also has a lot of promise because of a close knit family with strong core values and because of his family's friendships in the community. There are a lot of people who believe in Graeme, who support him in this self-imposed time of trouble, and who are confident he will show this Court and the world the person he really is.

So, counsel suggests the initial question is – does Graeme Harris need to go to jail? Undersigned counsel submits the answer to that question is no, he does not. Graeme fully recognizes the folly of the conduct and attitudes that bring him before this Court. He has grown, improved and become more serious as a person. He continues to make himself successful in life as he continues to study and take classes at the University level and spend his summers, weekends and holidays working in the family's business to earn income to support himself as a college student. Undersigned counsel urges the Court to fashion a disposition of this case that allows Graeme to continue his education and his employment in his family's business.

Do the Sentencing Guidelines require Graeme to be sent to jail? Again undersigned counsel submits the answer is no. Counsel further submits that §5C1.1 of the Sentencing Guidelines together with the applicable statutory §3553 factors and applicable Supreme Court

decisions on guideline interpretation and application as cited at the beginning of this Memo give this Court ample latitude in fashioning an alternative sentence.

What §3553 factors specifically warrant the Court to give Graeme an alternative sentence? First, undersigned counsel submits that 18 USC §3553(a)(1) supports the Court in fashioning an alternative sentence. Counsel has discussed at length above both the nature and circumstances of this offense and the history and characteristics of the Defendant. Specifically, counsel has explained the role of alcohol in the commission of the offense and the fraternity influence at the University of Mississippi. As to the history and characteristics of the Defendant, counsel has likewise explained above the lack of criminal history of the Defendant, except for misdemeanor alcohol possession charges. Counsel has explained the nature of the Defendant's personal background, the family from which he has come, their core values and their work ethic - which has certainly been imparted to Graeme Harris.

As to considerations under §3553(2)(A)...... "To provide just punishment for the offense", counsel submits that the punishment in this case can be just without subjecting Graeme to incarceration, and in terms of §3535(2)(B) and (C), counsel submits that Graeme should not be subjected to incarceration. With Graeme's family background, his network of support, and his positive personal characteristics, the likelihood that Graeme Harris will engage in further criminal conduct is minimal, if at all. There is nothing about this case at the time it happened, nor at any time since up to the present to suggest that Graeme Harris needs to be further deterred from any further criminal conduct. What Graeme has put his family through, what he has done to himself and the harm he has caused to others at the University of Mississippi have all taught him some serious life lessons from which plenty of deterrence flows.

As to section §3553(A)(2)(D), Graeme doesn't need to be incarcerated for educational or vocational training. Educationally, he is continuing in an undergraduate business degree program at the University of North Georgia and is enrolled this semester. Nor does Graeme need to be incarcerated to receive vocational training. He has a meaningful job doing important, serious and even dangerous work for Engineering & Wireless, LLC. In addition to performing the work duties he is qualified to presently perform, Graeme continues to learn at the hands of his father additional aspects of the electronic cell tower business.

VII.

CONCLUSION

After Graeme was indicted, undersigned counsel had a lengthy meeting with Graeme and his parents. In that meeting counsel explained the litigation process, discussed the discovery disclosure of information and identified various legal issues, some of Constitutional significance, which could be raised in Graeme's defense. Counsel then asked how they wanted to proceed. Mr. and Mrs. Harris appropriately deferred to their young son as to how to proceed since the situation he is in is of his own doing. Graeme promptly said he did what he did, he didn't want a trial, he wanted to accept responsibility and get the legal matter behind him and over with as quickly as possible. In counsel's opinion, Graeme has shown maturity beyond his years in making that decision and in trying to make the best of the situation he has created for himself, including continuing with his education, continuing to earn an income and learn more about the cell tower business, and in enrolling in an alcohol therapy program to increase his awareness of alcohol abuse and how alcohol creates legal as well as physical, emotional and mental health issues.

Undersigned counsel submits that Graeme shows the promise of rebounding completely from these legal problems, and that he has a personal commitment to success, and the intangible work ethic, and a strong surrounding support network sufficient to complete that promise.

Accordingly, undersigned counsel asks the Court to fashion a sentence for Graeme that takes into account all of his promise, that allows him to continue to pursue his education and that allows him to continue to earn an income and learn vocationally through continuing to work.

Specifically, undersigned counsel asks the Court to fashion a sentence for Graeme that includes conditions of probation, supervised release and community service.  Such a sentence corrects by punishing, supervising, teaching and rehabilitating.

DATED this 2nd day of September, 2015.

RESPECTFULLY SUBMITTED,

GRAEME PHILLIP HARRIS, Defendant


BY:    <u>/s/David G. Hill</u>    .
          DAVID G. HILL, MS Bar No. 2444
          Law Office of David G. Hill
          Post Office Box 429
          Oxford, MS 38655
          Phone (662) 234-4315
          Facsimile (662) 236-7996

<u>CERTIFICATE OF SERVICE</u>

I, DAVID G. HILL, attorney for the Defendant in the above and foregoing action, do hereby certify that I have electronically filed the above and foregoing with the Clerk of the United States District Court using the ECF system which sent notification of such filing to the following:

judge_mills@msnd.uscourts.gov
Judge Michael P. Mills

bob.norman@usdoj.gov
Mr. Bob Norman, AUSA

chad.lamar@usdoj.gov
Mr. Chad Lamar, AUSA

And have forwarded a copy to the following via electronic mail as indicated:

Brandon_Cole@msnp.uscourts.gov
Brandon Cole, US Probation

DATED this 2nd day of September, 2015.


/s/ David G. Hill                                            .
DAVID G. HILL, MS Bar No. 2444